UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KYLE PASCHAL-BARROS      :
      :
Plaintiff,      :  No. 19-cv-740
      :
v.      :
      :  November 24, 2021
DAVID ANAYA, et al.,      :
      :
Defendants.      :
      :

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 79]**

This is a section 1983 action brought by Kyle Lamar Paschal-Barros[1] ("Plaintiff"), an inmate under the custody of the Connecticut Department of Corrections ("DOC"), against Warden Nick Rodriguez, Deputy Warden Derrick Molden, Captains David Anaya, James Sharp and Gregorio Robles, Lieutenants Matthew Prior, Kevin Artz, T. Hollister, and Nurse Pavel Balatka. On July 15, 2019, the Court issued an Initial Review Order ("IRO") pursuant to 28 U.S.C. § 1915A(b) reviewing Plaintiff's complaint, dismissing certain claims and permitting other claims to proceed.  [IRO, Dkt. 8].  As interpreted by the Court in the IRO, Plaintiff alleges in his complaint that: (1) Captain Anaya used excessive force against him and Lieutenants Artz and Hollister and Nurse Balatka failed to intervene to stop the use of force, (2) Captain Anaya subjected Plaintiff to unconstitutional conditions of confinement, and (3) Captains Sharp and Robles, Warden Rodriguez and Deputy

---

[1] Plaintiff Kyle Paschal-Barros is also known and referred to as Deja Paschal. [Def.'s Loc. R. 56(a)2 at ¶ 1].

Warden Molden became aware of the use of force but took no action to remedy the matter.  The Court dismissed claims brought against Lieutenant Robles and Captain Prior, and allowed the other claims to proceed.

Before the Court is the remaining Defendants' motion for summary judgment.  [Mot., Dkt. 79].  Defendants argue that (1) Plaintiff failed to exhaust administrative remedies, and (2) an entitlement to summary judgment on the supervisory liability against Captain Sharp, Deputy Warden Molden, and Warden Rodriguez.  Plaintiff opposes, arguing that Plaintiff did exhaust available administrative remedies.  Plaintiff also argues that the facts Defendants rely on in relating to supervisory liability are disputed.

After careful review of the pleadings, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.  As detailed below, the Court finds that Plaintiff did properly exhaust available administrative remedies.  The Court also finds that Defendants are entitled to summary judgment on the supervisory liability claims raised against Captain Sharp, Deputy Warden Molden and Warden Rodriguez.

I.      Standard of Review

When filing a motion for summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary

judgment).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

If a motion for summary judgment is supported by documentary evidence and sworn affidavits that demonstrate "the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).  *See also Welch-Rubin v. Sandals Corp.*, No. 3:03cv481, 2004 WL 2472280 (D. Conn. Oct. 20, 2004). Thus, the party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson*, 781 F.3d at 44.

In reviewing the record, the Court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted).  *See also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) ("[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").  The Court may not, however, "make credibility determinations or weigh the evidence. . . . [because] [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 607–08 (2d Cir. 2017) (internal quotation marks and citations omitted).  If there is

any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, however, summary judgment is improper.  *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

II.     BACKGROUND

A. Local Rule 56(a)

Prior to detailing the background of this case, the Court must first address arguments raised relating to the Local Rule 56(a)2 statement.  Defendant argues that the Court should deem as admitted all facts contained in its Statement of Undisputed Facts because Plaintiff failed to properly object to these facts as required under the Local and Federal Rules of Civil Procedure.

Local Rule of Civil procedure 56(a) outlines the local requirements for filing and responding to a motion for summary judgment, including the Local Rule 56(a) statement requirements.  Local Rule 56(a)1 requires the party moving for summary judgment to file and serve a memorandum entitled "Local Rule 56(a)1 Statement of Undisputed Material Facts."  This memorandum is required to "set forth, in separately number paragraphs . . . a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  Loc. R. 56(a)1.  When responding to the motion for summary judgment, the nonmoving party is to provide a Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment, "which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the

4

fact as permitted under Federal Rule of Civil Procedure 56(c)." Loc. R. 56(a)2. Local Rule 56(a)3 provides that each statement of material fact must be followed by a specific citation. The failure to provide specific citations may result in the court deeming a fact admitted, or imposing sanctions: "including, when the movant fails to comply, an order denying the motion for summary judgment, and when the opponent fails to comply, an order granting the motion if the motion and supporting materials show that the movant is entitled to judgment as a matter of law." Loc. R. 56(a)3.

Rule 56 of the Federal Rules of Civil Procedure require "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. Pro. 56(c). In reviewing a motion for summary judgment, "[t]he court need consider only cited materials, but it may consider other materials in the record." Rule 56(c)(3). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Rule 56(e).

Here, Defendants properly filed their Local Rule 56(a)1 statement with their motion for summary judgment.  [Def.'s Loc. R. 56(a)1].  With Plaintiff's opposition, he filed a Local Rule 56(a)2 statement, which responded to each of Defendants' paragraphs from the Local Rule 56(a)1 statement and proposed additional facts.  [Pl.'s Local R. 56(a)2].  Many of Plaintiff's responses and allegations cite to his own affidavit as support.  [*Id.*].  However, at the time the Local Rule 56(a)2 statement was filed, Plaintiff failed to attach his affidavit as an exhibit.

Defendants timely filed a reply, arguing that all facts contained within the Local Rule 56(a)1 statement should be deemed admitted as Plaintiff failed to properly contest these facts.  [Reply].  Defendants point to Plaintiff's failure to file his affidavit to support his citations in the Local Rule 56(a)2 statement.  One week later, Plaintiff filed his affidavit.  [Pl.'s Aff., Dkt. 88].

While the Court admonishes Plaintiff for failing to timely file his affidavit, it would be unjust to fail to consider it in adjudicating this motion for summary judgment.  The time between when it was due and when it was filed is minimal.  The error appears to have been a mere clerical oversight.  Defendants should not be surprised by the contents of the affidavit because the statements contained within the Local Rule 56(a)2 statement largely mirror the statements contained in the affidavit.  Defendants had an opportunity to respond to the contents contained therein in their reply brief, and they did so.  [Reply, Dkt. 86].

Therefore, the Court will consider Plaintiff's affidavit in adjudicating Defendants' motion for summary judgment.

**B. <u>Credibility of Plaintiff's Affidavit</u>**

Defendants do not outwardly argue that the Court should consider the credibility of Plaintiff's affidavit, but the context of their reply brief suggests they may be trying to raise such an argument.  For the purpose of producing a complete record, the Court will address this issue.

A party's own affidavit may be enough to fend off summary judgment if it is based on personal knowledge and is consistent with prior pleadings and testimony. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 53 (2d Cir. 1998) (reversing district court grant of summary judgment because district court did not give party's affidavit weight and affidavit was consistent with prior pleadings and testimony); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (same).

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . .  and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal citations omitted).

In *Jeffreys*, the Second Circuit affirmed a finding from the District Court that the case presented one of the 'rare circumstances' that warranted discrediting the plaintiffs' own testimony because his testimony was replete with inconsistencies and improbabilities.  426 F.3d 549.  The plaintiff in *Jeffreys* brought a § 1983 claim,

generally claiming excessive force by police, who he claimed beat and threw him out of a third story window. *Id.* at 551.  The defendants presented evidence showing that the plaintiff on at least three occasions confessed to having jumped out of the window himself and the plaintiff did not begin claiming excessive force until 9 months later, though he had opportunities to do so. *Id.* at 552.  When questioned about the incident, the plaintiff could not identify any characteristics of the police officers who allegedly threw him out of the window and could not recall how many officers were involved. *Id.*  The plaintiff claimed he lost consciousness but the physician who examined him shortly after the incident found no evidence of any head trauma. *Id.* at 553.  The district court found, and the Second Circuit affirmed, that the plaintiff's "own testimony [was] so replete with inconsistencies and improbabilities that a reasonable jury could not find that excessive force was used against him." *Id.* at 553.  The district court also stated that "permitting [the plaintiff] to present such incredulous testimony at trial would be a terrible waste of judicial resources and a fraud on the court." *Id.*

Here, the Court will rely on the factual claims contained therein that are based on Plaintiff's personal knowledge and is consistent with prior pleadings. Defendants do not argue, and this case does not present, one of those rare circumstances that would warrant rejecting Plaintiff's own statements contained in his affidavit.  There is nothing to suggest that Plaintiffs statements contain the kind of inconsistencies and improbabilities that would warrant a credibility analysis, much less the inconsistencies and improbabilities at issue in *Jeffreys.*

Therefore, the Court will consider Plaintiffs factual claims contained in his affidavit, but only those claims that are based on personal knowledge.

C. <u>General Complaint Allegations</u>

On November 28, 2018, at roughly 8:00AM, while housed at Northern Correctional Institution, Plaintiff covered his cell window in violation of DOC rules. [Pl.'s Loc. R. 56(a)2 at ¶¶ 2–3]. Plaintiff was instructed to uncover his window, but he did not do so immediately.[2]  [*Id.* at ¶ 4].  Thereafter, Lieutenant Prior placed Plaintiff in in-cell restraints.  [*Id.* at ¶ 5].  Plaintiff was removed from in-cell restraints on December 1, 2018, after approximately 47 hours.  [*Id.* at ¶ 7].

On November 29, 2018, a "Critical Incident Brief" was completed listing the following eight staff members were involved at least on that date: (1) Correction Officer Titus, (2) Lieutenant Prior, (3) Correction Officer Carlson, (4) Correction Officer McCarthy, (5) Correction Officer Reale, (6) Correction Officer Massop, (7) "LPC" Longo, and (8) Registered Nurse ("RN") Durko.  [Def.'s Ex. C at 4].  However, that same day a separate report shows only six members were involved: Titus, Prior, Massop, Reale, McCarthy, and Carlson.  [*Id.* at 5].  A report was created by LCSM Cyr, which suggests she was also present, but is not listed as an involved staff member in any of the summarizing reports.  [*Id.* at 12].  There are also incident reports completed on November 30, 2018, from persons not on the list of staff

---

[2] The parties disagree as to whether and how long Plaintiff refused staff instructions to uncover his window.  [*Id.*].  Though Plaintiffs motion states a video of the incident was going to be filed by Defendants under seal, no such filing was made.  However, this dispute is not material to the issues raised in Defendants' motion for summary judgment.  Rather, this fact just provides some context into the allegations underlying this action.

involved, including Lieutenant Josefiak, Correction Officer Thompson, Correction Officer Carbonneau, and Correction Officer Ackerman. [*Id.* at 13–14, 17–18].  There are incident reports completed on December 1, 2018 from other persons not previously listed, including Lieutenant Richards.  [*Id.* at 20].  Captain Anaya wrote an incident report over a month later, where he states he was present on November 29, 2018.  [*Id.* at 22].  Lieutenant Artz and Nurse Balatka also completed reports over a month after stating they were present on November 29, 2018.  [*Id.* at 23–24].  On January 11, 2019, Captain Sharp signed a "Shift Commander Overview and Notification Sheet" generally indicating that he reviewed the incident report related to the event and concurred with the officers' conduct.  [Def.s' Ex. C at 2].  On January 29, 2019, Deputy Warden Molden signed a "Shift Commander Overview and Notification Sheet" briefly summarizing that the Deputy Warden reviewed the incident and finds it was handled in accordance with department policy and procedure.  [Def.'s Ex. C at 3].

D. <u>Exhaustion of Claims Against Warden Rodriguez, Deputy Warden Molden,</u>
   <u>Captains Sharp and Anaya, Lieutenants Hollister and Artz</u>

The key issue raised in Defendant's motion for summary judgment is whether Plaintiff exhausted administrative remedies as required under the Prisoner Legal Reform Act ("PLRA").  *See infra.*  Important to this consideration is the grievance procedures that were in placed and properly publicized to the inmate population at the time of the incident.  Defendants have provided the Administrative Directive ("AD") 9.6, entitled Inmate Administrative Remedies, that has an effective date of August 15, 2013; [Def.s' Ex. E]; AD 6.6, entitled Report of

Incidents, that has an effective date of July 20, 2015; [Def.'s Ex. D]; and AD 8.9,

entitled Administrative Remedy for Health Services.  [Def.'s Ex. M].

Beginning with AD 9.6, the stated policy for this AD is as follows:

The Department of Correction shall provide a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority.  The Inmate Administrative Remedies Procedure enables the Department to identify individual and systematic problems, to resolve legitimate complaints in a timely manner and to facilitate the accomplishment of its mission.

 [Def.s' Ex. E at 1].  AD 9.6 also provides that "[t]he Inmate Grievance Procedure

shall be the administrative remedy for any issue relating to policy and procedure,

and compliance with established provisions."  [*Id.* at 5].

Section 6(A) of AD 9.6 provides the following rules on informal resolutions:

An inmate must attempt to seek informal resolution prior to filing an inmate grievance. The inmate may attempt to resolve the issue verbally with the appropriate staff member or with a supervisor/manager. If the verbal option does not resolve the issue, the inmate shall submit a written request via CN 9601, Inmate Request Form. The inmate must clearly state the problem and the action requested to remedy the issue. The request must be free of obscene or vulgar language or content. The completed CN 9601, Inmate Request Form shall then be addressed to the appropriate staff member and deposited in the appropriate collection box. The Unit Administrator shall ensure that inmate request forms are collected and delivered in a timely manner. . . .

[*Id.*].

Section 6(C) provides the following rules on filing a grievance:

An inmate may file a grievance if the inmate is not satisfied with the informal resolution offered. The inmate shall attach CN 9601, Inmate Request Form, containing the appropriate staff member's response, to the CN 9602, Inmate Administrative Remedy Form. If the inmate was unable to obtain a blank CN 9601, Inmate Request Form, or did not receive a timely response to the inmate request, or for a similar valid reason, the inmate shall include an explanation indicating why CN

11

**9601, Inmate Request Form, is not attached. The completed CN 9602, Inmate Administrative Remedy Form, along with any relevant documents, shall be deposited in the Administrative Remedies box. The grievance must be filed within 30 calendar days of the occurrence or discovery of the cause of the grievance.**

[*Id.* at 6].

Sections 6(I) provides that at Level 1 review, which is the initial level of review of a grievance, response shall be in writing within 30 business days of receipt by the Level 1 reviewer. If no response is received, the inmate may appeal to Level 2. An inmate has 5 days after disposition of the Level 1 review to appeal to Level 2. [*Id.* at 7]. The Level 2 reviewer has 30 days to respond. [*Id.*].

AD 9.6 section 6(E) provides rules for when a grievance is returned without disposition:

**A grievance may be returned without disposition to the inmate for failure to:**
    **1. attempt informal resolution;**
    **2. adequately explain why a response to CN 9601, Inmate Request Form, is not attached; or,**
    **3. comply with the provisions of Section 5(E)(1-5) of this Directive.**
**Returned without disposition signifies that the grievance has not been properly filed and may be re-filed after the inmate has corrected the error. CN 9606, Grievance Returned Without Disposition shall be attached to all grievances returned without disposition to indicate the reason for the return.**

[Def.s' Ex. E at 6]. This rule does not state a time limit for when return must happen or the consequence if returned after the grievance period closes. Since the

November 2018 events, the DOC has changed AD 9.6 to provide that inmates will have 5 calendar days to correct the defects and resubmit.[3]

A key issue in this case is when Plaintiff's Level 1 grievance was filed.  There are competing records.  The first set of records are Grievance Logs, authenticated by Administrative Remedy Coordinator ("ARC") Saunders.  [Def.s' Ex. F at ¶¶ 4, 17].  The Grievance Log shows that on "11/26" ARC Schold reported receiving a grievance from Plaintiff, which was disposed of on "1/20".  [Def.s' Ex. G at 1].  The Log then provides that on "1/10/19" receipt of a grievance for "Staff conduct," that was disposed of on "3/7."  [*Id.* at 8].  This entry also notes at Level 2: "Date RCVD" as 4/4 and "Disp. Date" as 4/15."  [*Id.*].

Defendants have also provided a document that entitled "Administrative Remedy Receipt," which is a yellow slip about 3 inches in height, with some handwritten notes underneath.  [Def.s' Ex. H].  These documents do not appear to be naturally part of the same document.  The yellow "Administrative Remedy Receipt" has handwritten notes showing receipt of a grievance on January 10, 2019.  [*Id.*].  The notes beneath the yellow slip say: "Grievance received on 12/12/18 no signature" "grievance refiled on 1/10/19" and "Rejected for time frame."  [*Id.*].  The notes section is not signed, nor dated.  [*Id.*].

Also provided is Plaintiff's Level 1 grievance complaint.  [Def.s' Ex. H at 2].  There is a signature affixed and in the date section next to the signature it states: "1/2/18 originally 12/12/18."  [*Id.*].  The bottom section of the form lists that the date

---

[3] *Administrative Directive Chapter 9 Classification*, Chapter 9.6 Inmate Administrative Remedies § 6(b)(1)(2)(a)(i)(1) (Apr. 30, 2021), available at: https://portal.ct.gov/DOC/AD/AD-Chapter-9.

received was 1/10/19, the disposition lists "Rejected," and the disposition date is 3/7/19." [*Id.*].  The complaint form states it was rejected as untimely.  [*Id.*].

Plaintiff submitted an affidavit, where he attests that he filed his Level 1 Grievance on December 12, 2018 by handing it to ARC Schold.  [Pl.'s Dec. at ¶ 32].  Nearly three weeks later, on January 2, 2019, Schold brought the Level 1 Grievance back and told him he could not process it because there was no signature.  [*Id.* at ¶ 35].  While Schold waited at the door, Plaintiff signed the form and immediately handed it back.  [*Id.* at ¶ 36].

Saunders recognized in her declaration that Plaintiff initially submitted a Level 1 grievance on December 12, 2018.  [Ex. F at ¶ 20].  Saunders then states that "A person seeking relief must submit an administrative remedy for with an original signature" . . . reasoning that "[t]he administrative remedy form is an official document, considered a business record, which is why an original signature is required."  [*Id.* at ¶ 21].  Saunders cites to no rule in place at the time of Plaintiff's grievance expressly stating that the form needed an original signature.  The most recent version of AD 9.6 now clearly states that an original signature is required, but this rule was not part of the AD 9.6 in place during the relevant times.[4]

---

[4] Defendants provided a copy of a Request for Inclusion or Revision to an Administrative Directive, fully executed February 28, 2017, which authorizes a change to Administrative Directive 9.6 that would require the Inmate Administrative Remedy Form to contain an "original signature."  [Reply at Ex. A. Request for Inclusion].  However, Defendants have not provided any further information stating when the change was publicized, or more importantly, whether it was publicized at the time of the incident.

Plaintiff filed a Level 2 grievance on March 20, 2019, which was rejected, claiming that the Level 1 grievance was untimely.  [Def.s' Ex. K].  Plaintiff attests he filed his Level 2 grievance within 5 days of receiving the disposition of the Level 1 grievance.  [Pl.'s Dec. at ¶ 39].  In the rejection, the DOC official checked off a box next to: "You have exhausted the Department's Administrative Remedies. Appeal to Level 3 will not be answered."  [Def.s' Ex. K].  However, a strikethrough line crossed out the first part of this section, specifically the part that said "You have exhausted the Department's Administrative Remedies."  [*Id.*].  This suggests that the DOC was informing Plaintiff that it did not believe Plaintiff exhausted his administrative remedies but at the same time was telling Plaintiff not to proceed further in appealing his grievance for further review.

E.  <u>Exhaustion of Claim Against Nurse Balatka</u>

The DOC has a separatee AD for exhausting administrative remedies for health services grievances.  That is, AD 8.9.  [Def.s' Ex. M].  AD 8.9 § 9 provides that there are two types of health services review; the first for diagnosis and treatment, and the second for review of an administrative issue.  [*Id.*].  Section 9(B) states that a review of an administrative issue is "a review of a practice, procedure, administrative provision or policy, *or an allegation of improper conduct by a health services provider.*"  (emphasis added).

Health service reviews require an inmate to first attempt to seek an informal review, which is virtually identical to the procedure laid out above for non-health related grievances.  *Compare* [Ex. M § 10] and [Ex. E § 6(A)].  Responses to health service grievances informal reviews are due within 15 days from receipt of the

15

written request.  [Ex. M § 10].  In seeking review for administrative issues, inmates are to "request a review of a practice or procedure by checking the 'All Other Health Care Issues' box on CN 9602, Inmate Administrative Remedy Form, and depositing it in the Health Services box."  [*Id.* at § 12].  Responses are due within 30 days.  [*Id.*].  An inmate can appeal the response within 10 days.  [*Id.*].

Plaintiff did not submit a separate Level 1 grievance complaint against Nurse Balatka aside from the complaint discussed above, nor did he provide more than one copy of his Level 1 grievance to be filed in the box for general grievances and the box for health service grievances.  Plaintiff attests that he included his "failure to intervene" claim against Nurse Balatka in the single Level 1 Grievance he handed to ARC Schold on December 12, 2018 on advice of the Health Services Review Coordinator, Nurse Kilham.  [Pl.'s Dec. at ¶ 34].  At the time, the same form was used for both administrative complaints and health services complaints.  [*Id.*].

III.    DISCUSSION

a.  <u>Exhaustion</u>

Defendants argue that Plaintiff failed to exhaust administrative remedies before court involvement.  Plaintiff opposes, arguing that he did exhaust all administrative remedies available to him.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), requires a prisoner to exhaust "administrative remedies as are available" before bringing an "action . . . with respect to prison conditions." This requirement applies to all claims pertaining to "prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of

available administrative remedies must occur regardless of whether the inmate may obtain the specific relief he desires through the administrative process. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

Additionally, an inmate must "proper[ly] exhaust[ ]" his or her administrative remedies which includes complying with all "critical procedural rules," including filing deadlines, as set forth in the particular prison grievance system. *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006) (proper exhaustion "means using all steps that the agency holds out . . . (so that the agency addresses the issues on the merits) ... [and] demands compliance with agency deadlines and other critical procedural rules"). Consequently, neither "untimely" nor "otherwise procedurally defective attempts to secure administrative remedies" meet "the PLRA's exhaustion requirements." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (citing *Woodford*, 548 U.S. at 83-84).

While the exhaustion with administrative remedies is mandatory, a prisoner is only expected to exhaust those remedies that are "available." *Ross v. Blake*, 578 U.S. 632, 638–39 (2016).  There are three circumstances in which an administrative remedy is not capable of use to obtain relief and an inmate's duty to exhaust available remedies does not come into play: (1) when an administrative remedy "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," (2) when "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use," and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44.

i.   **Exhaustion of Claims Against Warden Rodriguez, Deputy Warden Molden, Captains Sharp and Anaya, Lieutenants Hollister and Artz.**

Here, the initial question is whether Plaintiff did exhaust his administrative remedies when he submitted his Level 1 Grievance complaint on December 12, 2018.  Defendants argue he did not because the form was not signed.  Plaintiff opposes arguing he did because there was no requirement in AD 9.6 at the time that the Level 1 Grievance complaint needed to be signed.  This question turns on whether a signature on this form is a "critical procedural rule" that must be complied with.  *See Woodford*, 548 U.S. at 91.

Case law in this circuit has distinguished cases with written and unwritten rules for the purpose of determining whether said rule is a "critical procedural rule."  In *Torres v. Anderson*, 674 F. Supp. 2d 394, 399–400 (E.D.N.Y. 2009) the district court found that a place-of-filing requirement, which at the time was not provided for in regulations nor internal procedures, was not a "critical procedural rule."  Relying on this precedent, another district court reasoned that: "When a procedural rule is in neither the regulations nor the internal procedures of the facilities that houses the prisoner, the courts may not regard it as a critical procedural rule for the purposes of administrative exhaustion." *Richardson v. Jakubowski*, No. 16-CV-6038-DGL-JWF, 2019 WL 4674199, at *2 (W.D.N.Y. Sept. 25, 2019) (citing to *Torres*, 674 F. Supp. 2d at 399).  In *Richardson*, the district court found that the plaintiff's failure to comply with the place-of-filing requirement, which had since been written and noticed in regulations, was a basis for finding failure to exhaust administrative remedies.

18

This case is substantially similar to *Miller v. Tanner*, 196 F.3d 1190 (11th Cir. 1999).[5]  In *Miller*, an inmate brought a section 1983 claim against various prison officials alleging serious constitutional violations.  The plaintiff in *Miller* submitted an initial grievance form but failed to sign and date it.  *Id.* at 1192.  The prison rejected the grievance, noting it was not signed or dated, and directed the plaintiff to not appeal because the grievance was terminated.  *Id.*  The district court granted the defendants' motion to dismiss, finding the plaintiff failed to exhaust his administrative remedies.  *Id.*  The Eleventh Circuit reversed, finding that the standard operating procedures then in place did not explicitly state that an inmate must sign and date the grievance form, and rejected the defendants' argument that it was a "common sense procedural requirement."  *Id.* at 1193–94.

Here, Defendants claim that an original signature is required on the administrative remedy form because it is an official document.   [Mot. at 11].  Defendants cite to a declaration by the current ARC, ARC Saunders, to support this claim.  [Def.s' Ex. F at ¶ 21].  However, ARC Saunders provides no factual or legal basis to support her opinion that an original signature is required.  [*Id.*].  AD 9.6, at the time of this grievance, did not state on its face that an original signature is required.  In their reply, Defendants change their position slightly to argue that the administrative directives do not need to say a signature is required because the Level 1 Grievance form includes a space for the inmate to sign.  However, nothing

---

[5] Though *Miller* came before the Supreme Court's recent jurisprudence clarifying the PLRA exhaustion requirement, the court in *Miller* applied the law as settled Specifically, the court in *Miller* did not grant a judicially created exception in finding the plaintiff did exhaust his administrative remedies, rather the court looked at what remedies were available and exhausted.  *Miller*, 196 F.3d at 1193.

on the form suggests that failing to sign will result in rejection and return. The Court thus rejects Defendants' argument that there is an original signature requirement under the DOC's ADs.

As in *Torres* and *Miller*, the Court finds that Plaintiff's initial failure to sign the Level 1 Grievance was not a critical procedural rule because the administrative directives at the time did not require such. Defendants' argument that the form has a signature line is not persuasive because there was nothing on the form noticing Plaintiff that the failure to sign could be a basis for rejection. Therefore, the Court finds that Plaintiff properly exhausted administrative remedies when he filed his Level 1 Grievance in December 2018, which was within the deadlines set forth in AD 9.6.

Even if the Court found that Plaintiff's signature on the Level 1 Grievance was a critical procedural rule, the Court would have found that administrative remedies were not available to Plaintiff because prison administrators thwarted Plaintiff's ability to exhaust through machination. The Court can find no justification in any of Defendants pleadings for why it took ARC Schold three weeks to inform Plaintiff that the Level 1 grievance was not signed and then over a week thereafter to log the signed grievance. ARC Schold did not inform Plaintiff of the minor error until exactly a day after the Level 1 grievance deadline. At best, ARC Schold was negligent in the handling and treatment of grievance complaints. At worst, and most likely, ARC Schold intentionally waited until right after the deadline passed for the purpose of thwarting Plaintiff's exhaustion efforts. Regardless of ARC Schold's intent, prison administrators thwarted Plaintiff's efforts to exhaust

his administrative remedies.  Therefore, even if the Court found that Plaintiff failed to properly exhaust his administrative remedies as provided for under the ADs, the Court would have otherwise found that a prison official thwarted Plaintiff's ability to exhaust, thus showing that exhaustion was not available as required under the PLRA.

ii.    Exhaustion of Claims Against Nurse Baltaka

Defendants argue that Plaintiff failed to properly exhaust his administrative remedies with respect to his claim against Nurse Baltaka because he did not file a Level 1 grievance as required under AD 8.9.  Plaintiff objects, arguing that Plaintiff mistakenly failed to submit a separate grievance against Nurse Baltaka due to the DOC's own opaque process and representations from the Health Services Review Coordinator ("HSRC") who told him he did not have to submit more than one grievance.

With respect to Plaintiff's argument as to the opaque process for filing complaints against health services members, Plaintiff points out that the form for a general grievance and a form for a health services grievance are the same form, which is designated as form CN9602. Selection 1 of the CN9602 directs the author to "SELECT ADMINISTRATIVE REMEDY A, B, OR C BELOW."  Option "A" is "I am filing a Grievance."  Option "B" is "I am requesting a Health Services Review."  Under option "B", there are two sub-options: "All Other Health Care Issues" and "Diagnosis/Treatment."  Option "C" is "I am filing an appeal of . . . ."   While the Court tends to agree that CN9602 is not the definition of clarity when applied to this case, AD 8.9 makes clear that Plaintiff was to have the form alleging "improper

conduct by a health services provider" deposited in the "Health Services box." [Def.s' Ex. M at 3–4]. Because Plaintiff did not provide more than one grievance complaint and did not direct ARC Schold to deposit the complaint in the Health Services box, Plaintiff has failed to comply with the exhaustion requirement as laid out in AD 8.9.

However, a genuine issue of material fact remains as to whether prison administrators thwarted Plaintiff from exhausting his administrative remedies as to this claim based on Plaintiff's unrefuted representation that an HSRC informed him not to submit more than one grievance. Defendants have not met their burden in demonstrating an absence of genuine dispute of material fact.

Therefore, the Court denies Defendants' motion for summary judgment as to the claim against Nurse Baltaka because a genuine dispute as to material facts remain as to whether prison administrators thwarted Plaintiff from taking advantage of the grievance process through misrepresentation.

b. <u>Supervisory Liability</u>

Defendants seek summary judgment on the claims against Captain Sharp, Deputy Warden Molden, and Warden Rodriguez, arguing Plaintiff has failed to establish liability against these supervisor officials who are not alleged to have been directly involved in the alleged unconstitutional restraint and conditions of confinement. Some brief procedural history is necessary in adjudicating this claim.

Plaintiff brought the operative and underlying complaint as a pro se litigant proceeding in forma pauperis. The Court issued an Initial Review Order ("IRO") on

22

July 15, 2019, where it summarized the allegations Plaintiff brought against Captain

Sharp, Deputy Warden Molden, and Warden Rodriguez as follows:

> Paschal-Barros alleges that he filed inmate requests and grievances
> addressed to Warden Rodriguez and Deputy Warden Molden regarding
> Captain Anaya's conduct and the fact that he remained hog-tied for over
> fourteen hours. He contends that Deputy Warden Molden did not respond to
> his request and Warden Rodriguez denied the grievance as having been filed
> in an untimely manner. In addition, attached to the complaint, is a report that
> was prepared by Captain Sharp regarding his investigation into Paschal-
> Barros's allegation against Captain Anaya regarding the shortening of the
> tether chain. Captain Sharp noted that Captain Anaya and Nurse Balatka
> were in Paschal-Barros's cell for approximately one minute which he
> determined was enough time to conduct a "cell check." Captain Sharp
> contended that his observation refuted Paschal-Barros's claim that the
> tether chained was shortened. Captain [Sharp] interviewed Captain Anaya
> who denied the allegations. Captain Sharp indicated that he expected to
> gather additional reports from the nurse and the officer who were also
> present during the cell check with Captain Anaya.

[IRO at 10–11, Dkt. 8].

At the time of this decision, the Court applied the then-binding precedent

under *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), which provided that

personal involvement for the purposes of a section 1983 claim can be shown in the

following ways:

> (1) the defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or
> appeal, failed to remedy the wrong, (3) the defendant created a policy or
> custom under which unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the defendant was grossly
> negligent in supervising subordinates who committed the wrongful acts, or
> (5) the defendant exhibited deliberate indifference to the rights of inmates by
> failing to act on information indicating that unconstitutional acts were
> occurring.

In applying *Colon*, the Court stated in the Initial Review Order:

> The court concludes that at this stage of the proceedings, Paschal-Barros
> has alleged sufficient facts to demonstrate the personal involvement of
> Warden Rodriguez, Deputy Warden Molden and Captain Sharp in addressing

the alleged use of excessive force and unconstitutional conditions of confinement imposed by Captain Anaya under the second and fourth *Colon* categories. He has alleged that these defendants had reason to know Captain Anaya ordered the tether chain shortened, but did not remedy the situation or were grossly negligent in supervising Captain Anaya. The Eighth Amendment excessive force and unconstitutional conditions of confinement claims will proceed against Warden Rodriguez, Deputy Warden Molden and Captain Sharp in their individual capacities.

[IRO at 11–12].

Since the issuance of the IRO, the Second Circuit decided *Tangretti v, Bachmann*, 983 F.3d 609 (2d Cir. 2020), which largely reversed the *Colon's* supervisory liability approach to establishing liability under section 1983. The Second Circuit, following post-*Iqbal* precedent, held "there is no special rule for supervisory liability . . . [i]nstead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 618. The Second Circuit applied this rule to actions where plaintiffs are alleging deliberate indifference claims, noting that "a plaintiff must prove both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to current or future health, and (b) that the defendant acted with 'deliberate indifference.'" *Id.* at 618–19. "Deliberate indifference in this context 'means the official must know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 619.

Defendants argue that Plaintiff failed to even allege in the complaint any facts that would subject Rodriguez, Molden, and Sharp to liability in this case because Plaintiff alleges no facts that these defendants were present or knew of

the in-cell restraint at or around the time Plaintiff was subject to the alleged unconstitutional condition of confinement.  Defendants also argue that they have facts that show these defendants became involved in this action months after the alleged wrongful conduct.  Plaintiff responds only to Defendants second argument, where he systematically reduces the "facts" presented by Defendants and shows that they are qualified statements at best unsupported by objective evidence.  However, Plaintiff has failed to respond to Defendants' argument that the allegations of the complaint don't establish a claim of liability.

Here, in applying the *Tangretti* framework, the Court finds that Plaintiff has failed to state a claim in his complaint of supervisory liability against Rodriguez, Molden, and Sharp.  Plaintiff's claims against these defendants were limited to their role as supervisors and not direct participants.  Plaintiff does not allege these defendants were aware of the incident when it was happening.  Rather, Plaintiff only claims that they failed to take action after the fact.

Because Plaintiff's complaint does not contain any factual allegations against these supervisor defendants that establish liability pursuant to section 1983, summary judgment must be granted in favor of those defendants because no genuine dispute as to material fact could exist to a claim that could not survive on the face of the complaint.  In addition, Plaintiff has presented nothing more than speculation and conjecture in his opposition that these defendants could have been present or could have known about the incident when it was happening.

Therefore, the Court grants summary judgment with respect to the claims brought against Rodriguez, Molden, and Sharp.

IV.     CONCLUSION

For the above reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.   The Clerk is directed to enter judgment in favor of Defendants Rodriguez, Molden, and Sharp.   All other claims proceed.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated this day in Hartford, Connecticut: November 24, 2021